## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

ANDREW O.,

       *Plaintiff,*

v.

COMMISSIONER OF SOCIAL
SECURITY,

       *Defendant.*

_____/

Case No. 1:24-cv-13186

Patricia T. Morris
United States Magistrate Judge

## MEMORANDUM OPINION AND ORDER ON
## CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 8, 10)

## I.    CONCLUSION

For the reasons set forth below, Plaintiff's motion for summary judgment (ECF No. 8) is **DENIED**, the Commissioner's motion for summary judgment (ECF No. 10) is **GRANTED**, and the decision of the administrative law judge (ALJ) is **AFFIRMED**.

## II.    ANALYSIS

### A.    Introduction and Procedural History

On April 11, 2022, Plaintiff filed an application for Supplemental Security Income, alleging he became disabled on August 10, 2021. (ECF No. 5-2, PageID.730). The Commissioner initially denied the application on February 21,

2023, and on reconsideration on June 9, 2023. (*Id.*). Plaintiff then requested a hearing before an ALJ, which was held telephonically on June 19, 2023. (*Id.*). The ALJ issued a written decision on July 26, 2024, finding Plaintiff was not disabled. (*Id.* at PageID.730–49). Following the ALJ's decision, Plaintiff requested review from the Appeals Council, which denied his request on October 7, 2024. (ECF No. 5-1, PageID.19–24).

Following the Appeals Council's denial of review, Plaintiff sought judicial review on November 27, 2024. (ECF No. 1). The parties consented to the Undersigned "conducting any or all proceedings in this case, including entry of a final judgment and all post-judgment matters." (ECF No. 3). The parties have since filed cross-motions for summary judgment for which briefing is complete. (ECF Nos. 8, 10, 12).

### B.  Standard of Review

District courts have jurisdiction to review the Commissioner's final administrative decisions pursuant to 42 U.S.C. § 405(g). The review is restricted solely to determining whether "the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (citation modified). Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th

Cir. 2007) (citation modified). "[T]he threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation modified).

A district court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). Courts will "not try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). "If the [Commissioner's] decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* (citation modified).

## C.   Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

3

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

(i) At the first step, [the ALJ] consider[s] [the claimant's] work activity, if any.  If [the claimant is] doing substantial gainful activity, [the ALJ] will find that [the claimant is] not disabled.

(ii) At the second step, [the ALJ] consider[s] the medical severity of [the claimant's] impairment(s).  If [the claimant] do[es] not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, [the ALJ] will find that [the claimant is] not disabled.

(iii) At the third step, [the ALJ] also consider[s] the medical severity of [the claimant's] impairment(s).  If [the claimant has] an impairment(s) that meets or equals one of [the] listings in appendix 1 of this subpart and meets the duration requirement, [the ALJ] will find that [the claimant is] disabled.

(iv) At the fourth step, [the ALJ] consider[s] [his or her] assessment of [the claimant's] residual functional capacity and . . . past relevant work. If [the claimant] can still do . . . past relevant work, [the ALJ] will find that [the claimant is] not disabled.

(v) At the fifth and last step, [the ALJ] consider[s] [his or her] assessment of [the claimant's] residual functional capacity and . . . age, education, and work experience to see if [the claimant] can make an adjustment to other work.  If [the claimant] can make an adjustment to other work, [the ALJ] will find that [the claimant is] not disabled.  If [the claimant] cannot make an adjustment to other work, [the ALJ] will find that [the claimant is] disabled.

20 C.F.R. § 404.1520(4); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

"Through step four, the claimant bears the burden of proving the existence

and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing his or her residual functional capacity (RFC), which "is the most [the claimant] can still do despite [his or her] limitations," and is assessed using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 214 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ determined Plaintiff was not disabled. (ECF No. 5-2, PageID.749). At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since August 10, 2021, the alleged onset date. (*Id.* at PageID.732). At step two, the ALJ found the following severe impairments: tremor; Parkinson's disease; obesity; bipolar disorder; major

5

depressive disorder; unspecified trauma and stressor-related disorder; persistent depressive disorder; mood disorder; anxiety disorder; panic disorder; social anxiety disorder; vascular neurocognitive disorder; posttraumatic stress disorder; and attention and concentration deficit. (*Id.* at PageID.732–33).

At step three, the ALJ found none of the impairments, either independently or in combination, met or medically equaled in severity or duration the criteria of any listing. (*Id.* at PageID.733). Next, the ALJ found Plaintiff had the RFC

> to perform light work as defined in 20 CFR 404.1567(b) except [he could] lift or carry 10 pounds frequently and 20 pounds occasionally; stand or walk for 6 hours in an 8-hour workday; sit for 6 hours in an 8-hour workday; push or pull within the aforementioned weight restrictions; never climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl; occasionally handle or finger with the right, dominant upper extremity; never have exposure to vibration or moving mechanical parts; attend and concentrate sufficiently to carry out simple instructions; never perform team or tandem tasks; and perform work that does not require interaction with the public.

(*Id.* at PageID.736–37).

At step four, the ALJ found Plaintiff was unable to perform any past relevant work. (*Id.* at PageID.748). However, at step five, the ALJ found other jobs in the national economy that Plaintiff could perform. (*Id.* at PageID.749). Specifically, the ALJ found Plaintiff could perform the requirements of a sorter (300,000 jobs in the national economy), a packer (320,000), and a cleaner (400,000). (*Id.*). The ALJ thus concluded Plaintiff was "not disabled." (*Id.*).

### E.      Administrative Record

Plaintiff raises two issues on appeal.  First, he argues the ALJ erred by failing to properly evaluate evidence from three medical opinions.  Second, he argues the ALJ failed to properly consider his need for a service dog.  While the Court has reviewed the entire record, it will only summarize the evidence relevant to Plaintiff's issues on appeal.

In January 2021, prior to the relevant period, Plaintiff was diagnosed with a benign familial tremor and was prescribed medicine for an intention tremor in his right and left arms.[1]  (ECF No. 5-1, PageID.346, 348).  By June, the left intention tremor had improved, but his right arm now showed a rest and intention tremor.[2] (*Id.* at PageID.354).  Plaintiff's doctor referred him to neurology to be evaluated for Parkinson's disease.  (*Id.* at PageID.355).

At the neurologist appointment in July, Plaintiff reported handwriting and using silverware were becoming more difficult, with his writing getting smaller and smaller.  (*Id.* at PageID.379).  The neurologist noted a resting tremor predominantly

---

[1] An intention tremor is a type of kinetic tremor, associated with voluntary movements, which start when the person makes an intended movement toward an object.  Tremor, Nat'l Inst. of Neurological Disorders and Stroke, https://www.ninds.nih.gov/health-information/disorders/tremor (last modified March 25, 2025).  Plaintiff was not observed to have a rest tremor at the time, which occurs when the person is at rest.  *Id.*

[2] The same symptoms showed throughout treatment.  (ECF No. 5-1, PageID.345, 358, 380–81, 383, 386, 389, 392, 396, 419, 637).

in his right arm and during ambulation; he also had a postural tremor in both upper extremities.  (*Id.* at PageID.380–81).  The neurologist concluded Plaintiff "definitely ha[d] a mixed tremor along with extrapyramidal symptoms and signs suggestive of possible early Parkinson disease." (*Id.* at PageID.381).  At an October follow-up, Plaintiff noted "significant improvement in his action tremor on Inderal LA, which [was] advised" to increase his dosage "but no change in his resting tremor." (*Id.* at PageID.382, 384).  At a follow-up appointment in January 2022, Plaintiff continued to note he felt "significant improvement in his postural action tremor but no changes in his resting tremor." (*Id.* at PageID.385).  His medication was not increased again. (*Id.* at PageID.387; *see also id.* at PageID.388–93, 397 (same improvement and medication for May and November 2022, and May 2023)).  In November 2022, Plaintiff noted he felt "stable and essentially unchanged" on the medication used to treat his tremor.  (*Id.* at PageID.391).  In May 2023, in addition to the significant improvement in his postural action tremor, Plaintiff noted some improvement in his resting tremor.  (*Id.* at PageID.395).

At other medical appointments he was noted to have normal strength in his upper and lower extremities in May 2022 (*Id.* at PageID.423); a mild hand tremor in July (*Id.* at PageID.579); and no tremors or abnormal movements were noted with no observable involuntary movements of the muscles of the arms, wrists, hands, or fingers in April through July and October through November 2023 (*Id.* at

PageID.693, 705, 708–09, 712, 714–15).

Plaintiff is married with two children and reports he is capable of doing basic chores, is independent in self-care and personal hygiene, drives a car, drops his kids off at school and gets them ready for bed, plays video games, helps take care of pets, mows the grass, texts and plays on his phone, goes to church and grocery shops, takes walks, and does small household repairs. (*Id.* at PageID.256–61, 276–83, 362, 368). By May 2023, Plaintiff was enjoying more activities and spending more time with friends and family. (*Id.* at PageID.711; *see also id.* at PageID.690 (same through November)).

In April 2023, Plaintiff reported to his mental health doctor he wanted to get a service dog for his anxiety. (*Id.* at PageID.718). In May the doctor "signed off on a letter of recommendation from the veterans affairs for the patient to have a service animal to help with his symptoms." (*Id.* at PageID.711). In June, he reported to his mental health provider that he had just received his service dog and he felt like it was a great decision; he continued to enjoy activities and spend time with friends and family. (*Id.* at PageID.708). In September, Plaintiff reported his dog "passed [the] last test on to public access."[3] (*Id.* at PageID.698). Plaintiff provided a letter

---

[3] It is unclear what test Plaintiff's service dog passed as this limited information comes from notes from Plaintiff's mental-health doctor. Plaintiff provided a letter from May 2024, which stated the dog was registered already as an emotional support animal but was still "in training as a Service Animal, and will soon enjoy full protections under the Americans with Disabilities Act." (ECF No. 5-1, PageID.329).

from the executive director of the veteran service dogs organization opining that Plaintiff "requires a Service Animal to be able to perform daily functions and provide for disability mitigating tasks.  It is the opinion of Veteran Service Dogs that [Plaintiff's] disabilities are so severe that he is unable to function and lead a normal life." (*Id.* at PageID.329).

In March 2022, Plaintiff completed a consultative medical exam with Dr. Harold Nims.  (*Id.* at PageID.367–75).  He reported his symptoms to Dr. Nims as follows:

> The claimant relates a 1-year history of shaking in the right hand.  He states that it shakes most of the day and night.  He has resting and intention tremors.  He has seen a neurologist and was told he has early onset Parkinson's disease.  The claimant states there is no family history that he knows of.  He is currently treated with primidone and propranolol, which he states helps the functioning in the hand, but he still continues to shake.  The claimant states he drops things frequently from the right hand.  His writing is quite sloppy.  He can hold a glass of water, but frequently spills the contents.  Using tools with the right hand is very difficult.  Using a cellphone is somewhat difficult.  He cannot open jars and bottles, but he is able to use buttons and zippers with the right hand, but somewhat slowly.  He states he now eats with his left hand. . . .  He does continue to drive a car.  He does mow the grass.  The claimant states he worked in heating and cooling for many years and can no longer use his right hand for technical skills such as electrical wiring and using tools.

(*Id.* at PageID.367).  Examination of his hands showed a 20 kg grip strength of force on his right hand and 30 kg grip strength on his left.[4]  (*Id.* at PageID.369).  His right-

---

[4] Standard grip strength for 40-year-old men is on average around 46 kg plus or minus about 10 kg.  Nicola M Massy-Westropp, et al., *Hand Grip Strength: age and gender*

hand finger squeeze was normal at 5/5.  (*Id.*).  Although he had a significant resting and intention tremor in the right hand, he only had mild difficulty picking up a coin and a pencil with his right hand.  (*Id.*).  His writing was noted as sloppy.  (*Id.* at PageID.372).   He was able to make a fist, button his clothes, tie his shoes, dress/undress, and dial a telephone.   (*Id.*).   He was noted as having no other symptoms of Parkinson's.  (*Id.* at PageID.370).  Dr. Nims summarized that Plaintiff "ha[d] severe resting and intention tremor in the right hand.  He appears to have moderate impairment of the dexterity in the right hand," and therefore concluded his "ability to perform work-related activities such as bending, stooping, lifting, walking, crawling, squatting, carrying, and traveling as well as pushing and pulling heavy objects is at least mildly impaired due to the objective findings described above."  (*Id.* at PageID.370–71).

Dr. Nims completed another evaluation of Plaintiff in January 2023.  (*Id.* at PageID.494–503).  In this evaluation, Plaintiff's right hand was noted to be mildly weak at 4/5, although he still measured 20 kg of force in two out of three tests.  (*Id.* at PageID.497).  His writing was noted to be very sloppy, and he had "severe difficulty picking up a coin or pencil with his right hand."  (*Id.*).  His left hand was normal and showed 56 kg of force.  (*Id.*).  Dr. Nims noted Plaintiff was only being

---

*stratified normative data in a population-based study*, at 3 (2011), available at
https://doi.org/10.1186/1756-0500-4-127.

treated with propranolol for his Parkinson's and he was not on any other Parkinson's medications yet.  (*Id.* at PageID.494, 497).  Dr. Nims summarized Plaintiff had "weak grip strength in the right hand and significant impairment of his dexterity due to his tremor" but concluded he was still only mildly impaired in the same work-related activities as his prior examination.  (*Id.* at PageID.498).

Dr. Tom Dees reviewed Plaintiff's medical records and concluded he had a limited right RFC for fingering (fine manipulation) and feeling (skin receptors) due to "moderate handling/Fingering of Rt hand [due to] moderate impairment of the dexterity in the right hand." (*Id.* at PageID.73).  He also limited Plaintiff to avoid concentrated exposure to vibration and hazards due to "moderate impairment of the dexterity in the right hand.  Parkinson's." (*Id.* at PageID.74).

Dr. Patricia Ko reviewed Plaintiff's medical records and made a disability determination explanation at the reconsideration level.  (*Id.* at PageID.84–94).  Dr. Ko recommended a manipulation limit for Plaintiff's right hand for both handling (gross manipulation) and fingering (fine manipulation) and explained "can occasionally use right hand for handling and fingering, but moderate impairment in dexterity of right hand due to [P]arkinson's limit use." (*Id.* at PageID.90).  She also recommended avoiding all exposure to vibration and hazards "due to moderate impairment of the dexterity of the right hand." (*Id.*).

F.    **Governing Law**

The ALJ must "consider all evidence" in the record when making a disability decision.  42 U.S.C. § 423(d)(5)(B).  The regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources, and nonmedical sources.  An acceptable medical source means a medical source who is a:

(1) Licensed physician (medical or osteopathic doctor);

(2) Licensed psychologist, which includes:

    (i)    A licensed or certified psychologist at the independent practice level; or

    (ii)    A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3) Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4) Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5) Qualified speech-language pathologist for speech or language impairments only. For this source, *qualified* means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language Pathology from the American Speech-Language-Hearing Association;

(6) Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only . . . ;

(7) Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice . . . ; or

(8) Licensed Physician Assistant for impairments within his or her licensed scope of practice . . . .

20 C.F.R. § 404.1502(a) (2021). A medical source is

an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law.

*Id.* § 404.1502(d). In contrast, a nonmedical source is "a source of evidence who is not a medical source." *Id.* § 404.1502(e). "This includes, but is not limited to: (1) [the claimant]; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The Social Security Administration (SSA) "will not defer or give any specific

evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." *Id.* § 404.1520c(a). "The most important factors [the SSA] consider[s] when evaluat[ing] the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.* § 404.1520c(c).

The first factor is "supportability." For this factor, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the opinion. In essence, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2).

In addition, the SSA will consider the source's "[r]elationship with the claimant." *Id*. § 404.1520c(c)(3). This factor includes analysis of:

    (i)     Length of the treatment relationship.  The length of time a medical source has treated [the claimant] may help demonstrate whether the medical source has a longitudinal understanding of [the claimant's] impairment(s);

    (ii)    Frequency of examinations.  The frequency of [the claimant's] visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of [the claimant's] impairment(s);

    (iii)   Purpose of the treatment relationship.  The purpose for treatment [the claimant] received from the medical source may help demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);

    (iv)   Extent of the treatment relationship.  The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);

    (v)    Examining relationship.  A medical source may have a better understanding of [the claimant's] impairment(s) if he or she examines [the claimant] than if the medical source only reviews evidence in [the claimant's] folder.

*Id.*

The fourth factor of the SSA's analysis is "specialization."  In making this determination, the SSA will consider

[t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty.

*Id.* § 404.1520c(c)(4).

Finally, the SSA will consider "other factors."  These may include any other information that "tend[s] to support or contradict a medical opinion or prior administrative medical finding."  *Id.* § 404.1520c(c)(5).  Other factors include "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, [it] will also consider whether new evidence [it] receive[s] after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive."  *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements."  The ALJ will consider "source-level articulation." Pursuant to this requirement,

> [b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record.  Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate.

*Id.* § 404.1520c(b)(1).  The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually."  *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors [the SSA] consider[s] when [it] determine[s] how persuasive [it] find[s] a medical source's medical opinions or prior administrative medical findings to be."  *Id.* § 404.1520c(b)(2).  As such, the SSA

> will explain how [it] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [the claimant's] determination or decision.  [The SSA] may, but [is] not required to, explain how [it] considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when [it] articulate[s] how [it] consider[s] medical opinions and prior administrative medical findings in [the claimant's] case record.

*Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported," and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors . . . for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision."  *Id.* § 404.1520c(b)(3).  The regulations clarify that the SSA is "not required to articulate how [it] considered evidence from nonmedical sources using the requirements of

18

paragraphs (a)–(c) of this section." *Id.* § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how [it] considered such evidence in [its] determination or decision, even under § 404.1520c." *Id.* § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities"; "[d]isability examiner findings," meaning "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate determination about whether [the claimant is] disabled"; and "[s]tatements on issues reserved to the Commissioner[,]" including

(i)     Statements that [the claimant is] or [is] not disabled, blind, able to work, or able to perform regular or continuing work;

(ii)    Statements about whether or not [the claimant has] a severe impairment(s);

(iii)   Statements about whether or not [the claimant's] impairment(s) meet the duration requirement . . . ;

(iv)    Statements about whether or not [the claimant's] impairment(s) meets or medically equals any listing in the Listing of Impairments . . . ;

(v)     Statements about what [the claimant's] residual functional capacity is using [the SSA's] programmatic terms about the functional exertional levels . . . instead of descriptions about [the claimant's] functional abilities and limitations . . . ;

(vi)    Statements about whether or not [the claimant's] residual functional capacity prevents [the claimant] from doing past relevant work . . . ;

(vii)    Statements that [the claimant] [does] or [does] not meet the requirements of a medical-vocational rule . . . ; and

(viii)    Statements about whether or not [the claimant's] disability continues or ends when [the SSA] conduct[s] a continuing disability review.

*Id.* § 404.1520b(c)(3).

The regulations also provide that

[b]ecause a decision by any other governmental agency or a nongovernmental entity about whether [a claimant is] disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on [the SSA] and is not [its] decision about whether [the claimant is] disabled or blind under [SSA] rules.

*Id.* § 404.1504.   Therefore, the SSA "will not provide any analysis in [its] determination or decision about a decision made by any other governmental agency or a nongovernmental entity about whether [the claimant is] disabled, blind, employable, or entitled to any benefits." *Id.*  The SSA will, however, "consider all of the supporting evidence underlying the other governmental agency or nongovernmental entity's decision that [it] receive[s] as evidence in [a] claim . . . ." *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* § 404.1502(f).  Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed,

apart from [the claimant's] statements (symptoms)." *Id.* § 404.1502(g).  Further,

"[s]igns must be shown by medically acceptable clinical diagnostic techniques.

Psychiatric signs are medically demonstrable phenomena that indicate specific

psychological abnormalities, e.g., abnormalities of behavior, mood, thought,

memory, orientation, development or perception, and must also be shown by

observable facts that can be medically described and evaluated." *Id.*  Laboratory

findings "means one or more anatomical, physiological, or psychological

phenomena that can be shown by the use of medically acceptable laboratory

diagnostic techniques," which "include chemical tests (such as blood tests),

electrophysiological studies (such as electrocardiograms and

electroencephalograms), medical imaging (such as X-rays), and psychological

tests." *Id.* § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in

which the SSA evaluates symptoms, including pain:

> In determining whether [the claimant is] disabled, [the SSA will]
> consider all [the claimant's] symptoms, including pain, and the extent
> to which [the] symptoms can reasonably be accepted as consistent with
> the objective medical evidence and other evidence.  [The SSA] will
> consider all [the claimant's] statements about [his or her] symptoms,
> such as pain, and any description [the claimant's] medical sources or
> nonmedical sources may provide about how the symptoms affect [the
> claimant's] activities of daily living and [his or her] ability to work.

*Id.* § 404.1529(a).  But the SSA clarified that

statements about [the claimant's] pain or other symptoms will not alone

> establish that [the claimant is] disabled.  There must be objective medical evidence from an acceptable medical source that shows [the claimant has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence of [the claimant's] pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that [the claimant is] disabled.

*Id.*  Further, "[i]n evaluating the intensity and persistence of [the claimant's] symptoms, including pain, [the SSA] will consider all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings, and statements about how [the claimant's] symptoms affect [him or her]." *Id.*  The SSA will "then determine the extent to which [the claimant's] alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how [the claimant's] symptoms affect [his or her] ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, [it] will carefully consider any other information [the claimant] may submit about [his or her] symptoms." *Id.* § 404.1529(c)(3).  This other information may include "[t]he information that [the claimant's] medical sources or nonmedical sources provide about [the claimant's] pain or other symptoms," such as "what may precipitate or

aggravate [the claimant's] symptoms, what medications, treatments or other methods [the claimant uses] to alleviate them, and how the symptoms may affect [the claimant's] pattern of daily living," which "is also an important indicator of the intensity and persistence of [the claimant's] symptoms." *Id.*

> Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that [the claimant's] medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . . [The SSA] will consider all of the evidence presented, including information about [the claimant's] prior work record, [the claimant's] statements about [his or her] symptoms, evidence submitted by [the claimant's] medical sources, and observations by [the SSA's] employees and other persons.

*Id.* Factors relevant to a claimant's symptoms, such as pain, include:

(i)      [D]aily activities;

(ii)     The location, duration, frequency, and intensity of . . . pain or other symptoms;

(iii)    Precipitating and aggravating factors;

(iv)     The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)      Treatment, other than medication, . . . received for relief of . . . pain or other symptoms;

(vi)     Any measures . . . used to relieve . . . pain or other symptoms.

*Id.*

The new regulations also impose a duty on the claimant: "[i]n order to get

benefits, [the claimant] must follow treatment prescribed by [his or her] medical source(s) if this treatment is expected to restore [his or her] ability to work." *Id.* § 404.1530(a).  Stated differently, "[i]f [the claimant does] not follow the prescribed treatment without a good reason, [the SSA] will not find [the claimant] disabled or, if [the claimant is] already receiving benefits, [the SSA] will stop paying . . . benefits." *Id.* § 404.1530(b).  Acceptable (or "good") reasons for failure to follow prescribed treatment include:

(1)     The specific medical treatment is contrary to the established teaching and tenets of [the claimant's] religion;

(2)     The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3)     Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)     The treatment because of its magnitude (e.g., open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for [the claimant]; or

(5)     The treatment involves amputation of an extremity, or a major part of an extremity.

*Id.* § 404.1530(c).

### G.     Argument and Analysis

Plaintiff argues the ALJ erred by failing to properly evaluate evidence from three medical opinions.  Second, he argues the ALJ failed to properly consider his

need for a service dog.

### 1.    Opinion Evidence

Plaintiff argues the ALJ erred when he failed to properly consider the opinions of Drs. Nims, Dees, and Ko.   (ECF No. 8, PageID.771 (citing ECF No. 5-1, PageID.74–74, 90–91, 498–500)).  This argument is not persuasive.

As discussed above, Dr. Nims described Plaintiff's dexterity as follows: "severe impairment of dexterity for small and large objects with right hand.  Can oppose fingers and make fist with both hands." (*Id.* at PageID.500).  Plaintiff's grip strength in his right hand was noted to be 4/5.  (*Id.*).  Dr. Nims summarized at the second consultative examination that Plaintiff "has weak grip strength in the right hand and significant impairment of his dexterity due to his tremor."  (*Id.* at PageID.498).  He concluded Plaintiff's "ability to perform work-related activities such as bending, stooping, lifting, walking, crawling, squatting, carrying, and traveling as well as pushing and pulling heavy objects is at least mildly impaired due to the objective findings described above."  (*Id.*).

The ALJ found Dr. Nims' opinion

> somewhat persuasive; it is generally supported by the author's clinical examination, which supports significant exertional and postural limitations, but this opinion does not state the most that the claimant can do despite his impairments.  Further, in regard to right upper extremity limitations, the opinion merely suggests that they are severe; it does not indicate the degree of severity.  A preponderance of the evidence including the physical examinations of record warrants limitation to no more than occasional handling or fingering with the

right upper extremity.

(ECF No. 5-2, PageID.746).

As a refresher, the Social Security Administration (SSA) "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a). An ALJ must explain his or her approach with respect to supportability and consistency when considering a medical opinion. *Id*. § 404.1520c(b). For supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(1). For consistency, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2).

Plaintiff argues the ALJ properly considered the supportability of Dr. Nims' opinion, but did not articulate the consistency factor and the Court should therefore remand for proper consideration. (ECF No. 8, PageID.772). But just because the ALJ did not use the word "consistency" does not mean he did not evaluate the

opinion "with the evidence from other medical sources and nonmedical sources in the claim."  First, the ALJ discussed that Dr. Nims did not specify the degree to which he thought Plaintiff was limited in his dexterity.  Second, discussing the evidence of record, the ALJ thought the evidence only supported a limitation of occasional handling or fingering.  This is consistent with the ALJ's discussion of Plaintiff's testimony, which he did not believe was consistent with the evidence of record.  (*See* ECF No. 5-2, PageID.745).  For example, the ALJ discussed that objective and clinical findings often revealed only mild or normal findings and that Plaintiff's treatment has been conservative and relatively minimal for his Parkinson's symptoms.  The ALJ further discussed Plaintiff's reported daily activities, which are inconsistent with the level of disability he claims.  It is not required that the ALJ reproduce the list of reasons a second time when explaining why a medical opinion is inconsistent; "'it suffices that [he or] she listed them elsewhere in [the] opinion.'"  *Ashley D. v. Comm'r of Soc. Sec.*, No. 22-cv-11344, 2023 WL 5266849, at *7 (E.D. Mich. July 17, 2023) (quoting *Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016)), *report and recommendation adopted*, 2023 WL 5251849 (E.D. Mich. Aug. 15, 2023).

Plaintiff also argues the ALJ may not discount a medical opinion as "vague," which he appeared to do when he stated Dr. Nims did not define the degree of severity that Plaintiff's dexterity was limited.  But Plaintiff's citation to *Betty Jo M.*

*v. Comm'r of Soc. Sec.*, No. 23-cv-00367, 2024 WL 4052174, at *6–*7 (S.D. Ohio Sept. 5, 2024), is unavailing.  There, the ALJ rejected a medical opinion solely because of the speculative nature of the opinion, without citing to evidence in the record.  This case is more like those distinguished in *Betty Jo*, where the ALJ discussed record evidence, found the medical opinion vague, and discussed that the medical examiner did not provide any specific functional limitations.  *See, e.g.*, *Benson v. Saul*, No. 19-cv-02804, 2021 WL 1554219, at *5 (N.D. Ohio Jan. 11, 2021), *report and recommendation adopted sub nom.*, *Benson v. Comm'r of Soc. Sec.*, No. 19-cv-2804, 2021 WL 804150 (N.D. Ohio Mar. 2, 2021); *Quisenberry v. Comm'r of Soc. Sec.*, 757 F. App'x 422, 434 (6th Cir. 2018)).

Here, the ALJ specifically pointed out that Dr. Nims did not state what Plaintiff could do, merely opined his limitations were severe.  The ALJ then went on to discuss record evidence showing Plaintiff's limitations were generally mild and conservatively treated.  *See also Schroeder v. Comm'r of Soc. Sec.*, No. 20-cv-10914, 2021 WL 2305623, at *13 (E.D. Mich. Apr. 21, 2021) ("ALJ did not err by declining to rely on [doctor's] opinion, which failed to specify . . . any other specific limitations [p]laintiff may have."), *report and recommendation adopted*, 2021 WL 2292332 (E.D. Mich. June 4, 2021).

To the extent Plaintiff argues Dr. Nims' opinion is consistent with other record evidence, this is an attempt to get this Court to re-weigh the evidence, which is not

its role.  "[T]he relevant inquiry is whether substantial evidence supports the ALJ's decision."  *Adams v. Comm'r of Soc. Sec.*, No. 23-3284, 2023 WL 6366106, at *4 (6th Cir. Sept. 28, 2023).  To the extent Plaintiff argues Dr. Nims' opinion is consistent with the other doctors' opinions that the ALJ discredited, this is not a winning argument as an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a).  This is especially true where the ALJ found those portions of the medical opinions to be similarly unsupported.

Plaintiff alleges a similar error with the ALJ's analysis of Dr. Dees' opinion. Dr. Dees found Plaintiff had limited fingering and feeling in his right hand and explained this was due to "moderate handling/Fingering of Rt hand [due to] moderate impairment of the dexterity in the right hand."  (ECF No. 5-1, PageID.73). The ALJ found

> this opinion persuasive in part; it is generally supported by explanation, but vague in use of the term 'moderate' to describe the claimant's handling/fingering limitations with the right upper extremity.  A preponderance of the evidence warrants limitation to no more than occasional handling/fingering with the right upper extremity.  Further, a preponderance of the evidence including the physical examinations of record warrants *greater* postural limitations . . . .

(ECF No. 5-2, PageID.747 (emphasis added)).

Plaintiff takes issue with the ALJ's conclusion that Dr. Dees' use of the word

"moderate" was vague.  But Plaintiff's argument does not explain why the opinion is not vague.  Instead, Plaintiff seeks a bright-line rule that an ALJ is never allowed to discount an opinion as vague.  (*See* ECF No. 8, PageID.775–76).  As discussed above, the vagueness of an opinion is a valid factor on which an ALJ may rely in assessing its supportability and consistency.  *See also Quisenberry*, 757 F. App'x at 434 (affirming ALJ's conclusion where discounted doctor's opinion was "quite vague"); *Katelyn M. v. Comm'r of Soc. Sec.*, No. 23-cv-12276, 2024 WL 4124675 (E.D. Mich. Sept. 9, 2024) ("[A]n ALJ can properly discount the weight of an expert opinion when it is too vague and does not support specific functional limitations.").

Indeed, like in *Katelyn M.*, where the doctor used vague programmatic terms like "somewhat impaired" and did not provide any specific description about her abilities and limitations in those areas, Dr. Dees' use of the word "moderate" could not help the ALJ determine Plaintiff's abilities with his right hand.  Dr. Dees was instructed to "[e]xplain [Plaintiff's] manipulative limitations" and "include the extent to which the function can be performed—*e.g.*, constantly, frequently, occasionally, never, etc." (ECF No. 5-1, PageID.73).  Dr. Dees did not use any of these defined terms which would have helped the ALJ assess Plaintiff's capability with his right hand.  For example, "'[o]ccasionally' means occurring from very little up to one-third of the time," whereas "'[f]requent' means occurring from one-third to two-thirds of the time."  SSR 83-10, 1983 WL 31251, at *5 (Jan. 1, 1983); *see*

*also* SSR 96-9P, 1996 WL 374185, at *2–*3 (July 2, 1996) ("[T]he RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to perform work-related activities. . . .  'Occasionally' means occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday.").  On the other hand, the term "moderate" is generally reserved for rating the degree of a person's mental limitations at steps two and three.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(F)(2)(c) (defining a moderate limitation as "functioning in this area independently, appropriately, effectively, and on a sustained basis is fair.").[5] Accordingly, the ALJ's description of Dr. Dees' use of the term "moderate" to describe Plaintiff's ability to handle as vague is supported by substantial evidence and does not constitute error.

Additionally, Dr. Dees opined Plaintiff could "occasionally" climb ladders, ropes, or scaffolds and could "frequently" climb ramps, stairs, balance, stoop, kneel,

---

[5] S*ee also* 2019 Supplemental ALJ Training Notebook, at 5, available at https://www.ssa.gov/foia/resources/proactivedisclosure/2020/2019_Supplemental%20ALJ%20Training%20Notebook.pdf ("The RFC is claimant-specific, and the B criteria ratings (e.g., moderate, marked) are too broad for use in the individualized RFC finding.  For example, an RFC should never simply state, 'the claimant has a moderate limitation in interaction with the public' because this does not adequately specify the individual's level of functioning.  Some of our terms, including 'occasional,' or 'frequent' are defined by policy or the Dictionary of Occupational Titles (DOT).  Therefore, a policy compliant RFC may use these terms without further explanation of their meanings.").

crouch, and crawl.  (ECF No. 5-1, PageID.72–73).  The ALJ disagreed and limited Plaintiff to "no" climbing ladders, ropes, or scaffolds and only "occasional" climbing of ramps or stairs, balancing, stooping, kneeling, crouching, or crawling. "An ALJ's more restrictive finding than that of the state agency physician's may be len[t] as support for the ALJ's finding." *McCoy v. Kijakazi*, No. 21-11739, 2023 WL 3407159, at *7 (E.D. Mich. Feb. 27, 2023) (collecting cases), *report and recommendation adopted*, 2023 WL 3147899 (E.D. Mich. Apr. 28, 2023).  The ALJ's engagement with the record and opinions in crafting the RFC is apparent from his inclusion of some restrictions greater than those suggested by Dr. Dees.

Finally, Plaintiff makes a similar argument with respect to Dr. Ko's opinion. Dr. Ko opined Plaintiff was limited in the use of his right hand for handling and fingering and thus limited Plaintiff to "occasionally use right hand for handling and fingering, but moderate impairment in dexterity of right hand due to [P]arkinson's limit use."  (ECF No. 5-1, PageID.90).  Similar to Dr. Dees, the ALJ found the opinion persuasive in part, adopted Dr. Ko's "occasional" handling and fingering limitations with the right hand, and rejected Dr. Ko's conclusion that Plaintiff could "frequently" climb ramps, stairs, balance, stoop, kneel, crouch, and crawl.  (ECF No. 5-2, PageID.747).  To the extent Plaintiff argues the ALJ erred when he failed to explain the supportability and consistency factors in rejecting Dr. Ko's postural limitations and imposing stricter limitations, this argument is "curious and

unavailing." *Mosed v. Comm'r of Soc. Sec.*, No. 14-cv-14357, 2016 WL 6211288, at *7 (E.D. Mich. Jan. 22, 2016) ("Plaintiff's argument that the ALJ erred in assessing a *more restrictive* RFC than that opined by the State agency consultants is curious and unavailing."), *report and recommendation adopted*, 2016 WL 1084679 (E.D. Mich. Mar. 21, 2016).   To the extent Plaintiff argues the ALJ failed in explaining the supportability and consistency of imposing occasional limitations on handling and fingering, the ALJ explained those limits in other parts of his analysis and need not repeat it again, as discussed above.

Plaintiff also argues the ALJ erred by not addressing Dr. Ko's "full opinion," explaining that Dr. Ko also found he had a "moderate" impairment in dexterity. (ECF No. 8, PageID.776–77).  He argues "[t]here is a distinction on how often a claimant can perform handling and fingering (e.g., never, occasionally, frequently, or constantly) and the amount that a claimant's dexterity is limited no matter how often it is performed."  (*Id.*).

But Plaintiff has not convinced the Court that Dr. Ko was imposing an additional limitation.  Instead, it seems Dr. Ko was trying to explain the limitation he gave ("occasional" handling and fingering).   Within a table indicating "manipulative limitations," Dr. Ko found "limited right" limitations for handling and fingering.  (ECF No. 5-1, PageID.90).  When asked to "[e]xplain [the] manipulative limitations and *how and why* the evidence supports your conclusions," Dr. Ko wrote

33

"can occasionally use right hand for handling and fingering [(explaining limitation)], but moderate impairment in dexterity of right hand due to [P]arkinson's limit use [(how and why evidence supports this limitation)]." (*Id.* (emphasis added)).  Thus, the first part of the sentence explains the limitations Dr. Ko imposed on Plaintiff and the second part of the sentence explains why, citing to specific record evidence.  This is further reinforced by Dr. Ko's similar explanations as to environmental limitations for vibrations and hazards: "avoid all work with hazardous machinery with moving parts and vibratory tools.  due to moderate impairment of the dexterity of the right hand."[6]  (*Id.*).  Additionally, under the section titled "RFC Additional Explanation," Dr. Ko wrote "[a] light RFC is reasonable and considers the right hand tremors that at times (at the CE) causes impairment in dexterity, along with bradykinesia and shuffling due to Parkinson's." (*Id.* at PageID.91).  The Undersigned is not convinced by Plaintiff's argument that Dr. Ko was trying to impose an additional limitation.  Instead, he was merely explaining the limits he imposed, which the ALJ adopted in his RFC by limiting Plaintiff to modified light work.

### 2.    Need for a Service Dog

Plaintiff next argues the ALJ erred by not considering Plaintiff's need for a

---

[6] Dr. Dees also used a similar structure in explaining his reasoning for Plaintiff's ability to handle and finger.  (*See* ECF No. 5-1, PageID.73–74 ("moderate handling/Fingering of Rt hand [due to] moderate impairment of the dexterity in the right hand. . . .  No vibratory tools and no Hazards machinery with moving parts [due to] moderate impairment of the dexterity in the right hand.  Parkinson's")).

service dog in his RFC analysis, despite recognizing that Plaintiff provided a letter from the organization that provided his service dog that he needed said service dog. (ECF No. 8, PageID.778).  However, Plaintiff's argument is more a disagreement with how the ALJ evaluated the evidence of his need for a service dog as the ALJ explicitly rejected his evidence as neither valuable nor persuasive: "I did not provide articulation about the evidence that is inherently neither valuable nor persuasive in accordance with 20 C.F.R. [§] 404.1520b(c) (e.g., . . . 15E is a Veteran Service Dogs Organization letter indicating '[Plaintiff's] disabilities are so severe that he is unable to function and lead a normal life')."  (ECF No. 5-2, PageID.747).

Both parties agree the Sixth Circuit has not evaluated how an ALJ is supposed to address a claimant's need for a service dog.  (ECF No. 8, PageID.777; ECF No. 10, PageID.801).  However, it is without doubt that it is "*Plaintiff* who bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and that [he or] she has a more restrictive RFC than that assessed by the ALJ."  *Ashley D.*, 2023 WL 5266849, at *10 (citation modified).  Some courts have held that "[a] claimant's use of a service dog must be considered by the ALJ when there is evidence of a prescription from a medical provider for the dog."  *Horne v. Saul*, No. 19-cv-013, 2020 WL 1547068, at *11 (E.D. Tenn. Mar. 31, 2020) (citing *McGehee v. Berryhill*, 386 F. Supp. 3d 80, 87–88 (D. Mass. 2019); *Cruz v. Comm'r of Soc. Sec.*, 406 F. Supp. 3d 1337, 1346 (M.D. Fla. 2019)); *see also Ackerman v.*

*Comm'r of Soc. Sec.*, No. 23-cv-1321, 2024 WL 5078035, at *3–*4 (W.D. Mich. Nov. 25, 2024) (requiring Plaintiff to present evidence of a prescription for a service animal).

Here, like in the cases cited above, Plaintiff has not presented sufficient evidence that a service dog was medically necessary such that this Court can say the ALJ erred.  First, there is no prescription from Plaintiff's doctor showing the need for a service dog.  Instead, Plaintiff provides a May 2024 "Service Dog Disability Statement" from the organization that provided the dog to Plaintiff.  (ECF No. 5-1, PageID.329).  It details that Plaintiff is enrolled in their service dog training program and opines that Plaintiff "requires a Service Animal to be able to perform daily functions and provide for disability mitigating tasks.  It is the opinion of Veteran Service Dogs that [Plaintiff's] disabilities are so severe that he is unable to function and lead a normal life."  (*Id.*).  It further provides that Plaintiff's dog is registered as an emotional support animal and is in training to become a full service animal.  (*Id.*).

The ALJ found the letter "neither valuable nor persuasive."  (ECF No. 5-2, PageID.747).  Indeed, this letter is not a "prescription from a medical provider." *Horne*, 2020 WL 1547068, at *11.  Nor does it even appear to be from a medical source at all, which means the ALJ is "not required to articulate how [he] considered [this] evidence."  20 C.F.R. §§ 404.1502(d); 404.1520c(d).  Although signed "Dr. Kirk Lanam – Executive Director," there is no indication what type of doctor Lanam

is (medical or otherwise), whether he has evaluated Plaintiff using objective methodologies, what the organization's requirements are to obtain a service animal, or any other information necessary for the ALJ to assess the supportability and consistency of the organization's opinion.  Lanam appears to be "public and private social welfare agency personnel," which is considered a non-medical source. 20 C.F.R. §§ 404.1502(e).  Additionally, at least as of the time the letter was written, Plaintiff's dog was not a certified service animal.  In sum, the letter merely concludes—without providing any supportive evidence for the ALJ—that Plaintiff is severely disabled and unable to function, which is a decision reserved for the Commissioner and is considered "neither valuable nor persuasive" in his evaluation. *See* 20 C.F.R. § 404.1520b(c)(3).

Nor does the record provide any other valuable evidence showing that Plaintiff's service dog is medically necessary.  In April 2023, Plaintiff reported to his mental health doctor he wanted to get a service dog for his anxiety.  (ECF No. 5-1, PageID.718).  In June, he reported to his mental health provider that he had just received his service dog and he felt like it was a great decision.  (*Id.* at PageID.708). In September, Plaintiff reported his dog passed the last test on to public access (which, as discussed above, is unclear).  (*Id.* at PageID.698).  Plaintiff's own reports about wanting to get a service animal are not enough to establish medical necessity.

In May the Plaintiff's mental-health doctor "signed off on a letter of

37

recommendation from the veterans affairs for [Plaintiff] to have a service animal to help with his symptoms." (*Id.* at PageID.711). This is the closest Plaintiff comes to showing the medical necessity of a service dog:

> While the Court notes the apparent absence of controlling Sixth Circuit authority on this topic, the *Mcgehee* Court noted that "[a]bsent a prescription, courts are split on whether a letter recommending a service dog from a medical source is sufficient to show that the dog is medically necessary." 386 F. Supp. 3d at 88 (*comparing Payano v. Colvin*, No. 2:15-cv-294-RFB-GWF, 2017 WL 4778593, at *4 (N.D. Nev. Oct. 23, 2017) (finding letter from psychiatrist recommending service dog alone does not support an assessment that a dog is necessary for the plaintiff to work), *with Santos v. Colvin*, No. 3:12-cv-5827-KLS, 2013 WL 5176846, at *5 (W.D. Wash. Sept. 12, 2013) (remanding where a doctor provided letter indicating that plaintiff required a service dog)).

*Horne*, 2020 WL 1547068, at *12. However, this notation in the doctor's treatment notes provide no information on what tests he performed, why he recommended the service dog, whether Plaintiff's ability to work was impacted, or other helpful and necessary information for the ALJ to evaluate Plaintiff's disability. Nor is the actual letter of recommendation included in the record. Thus, like in *Horne*, the Court finds "that Plaintiff has failed to establish that a service animal was medically necessary. The referenced letter [of recommendation] does not detail that such an animal was medically prescribed or provide an opinion on the impact of a service animal on Plaintiff's ability to work." *Id.* (collecting cases). As such, the Court concludes that the ALJ did not err on this issue.

## III.   **ORDER**

For these reasons, Plaintiff's motion (ECF No. 8) is **DENIED**, the Commissioner's motion (ECF No. 10) is **GRANTED**, and the ALJ's decision is **AFFIRMED**.

**IT IS SO ORDERED.**

Date: January 12, 2026                          S/ PATRICIA T. MORRIS
                                                Patricia T. Morris
                                                United States Magistrate Judge